

THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br> **And the STATE OF VERMONT** <br> *ex rel.* **Robert Hoffman,** <br><br> Relator/Plaintiff, <br><br> v. <br><br> **UNIVERSITY OF VERMONT** <br> **MEDICAL CENTER INC., and** <br> **ONECARE VERMONT ACCOUNTABLE** <br> **CARE ORGANIZATION, LLC,** *et al.* <br><br> **Defendants.** | **Civil Action No:** 5:18-cv-126 <br><br> **FILED *IN CAMERA* AND UNDER SEAL** <br><br> **FEDERAL AND STATE FALSE CLAIMS ACTS; MEDICARE AND MEDICAID FRAUD** |

>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>

## *COMPLAINT AND JURY DEMAND*

The United States of America, and the State of Vermont, by and through *qui tam* Relator, Robert Hoffman, bring this action under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*, as amended, Vermont's False Claims Act, 32 V.S.A. § 631, *et seq,* and Vermont's common law prohibiting wrongful dismissal from employment and retaliation for reporting violations of the statutes and common law, seeking appropriate and adequate reimbursements, penalties, damages and other remedies on behalf of the federal and state governments for violations of the referenced statutes and common law.

## Jurisdiction and Venue

The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331 and 31 U.S.C. 3732, the latter of which specifically confers jurisdiction for actions brought pursuant to 31 U.S.C. 3729 & 30.

There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. 3730(e), as amended.

Accompanying the *Qui Tam* Complaint is the *Relator's 31 U.S.C. § 3730(b)(2) Disclosure Statement with Exhibits – Under Seal.*

### The Relator

1. Relator Robert Hoffman was the manager of Accountable Care Organization ("ACO") Analytics for defendants, leading the Analytics team for 125,000 attributed ACO lives covered by Medicare, Medicaid and commercial insurance carriers as liaison with strategic leadership stakeholders from payer partners, network hospitals, affiliated ACO's, and government agencies.

2. Defendant University of Vermont Medical Center, Inc. ("UVMMC") paid the compensation and benefits directly to Relator and other staff of Defendant OneCare Vermont Accountable Care Organization, LLC. ("OneCare," "OCV").

3. On defendant's behalf, the Relator was responsible for strategic re-alignment of teams; Agile Project Management Implementation; expanding new roles and ladders; performing a 300-hour diligence study; and performing a "Gap Analysis" employing previously unused quantitative, utility-value methodology for scoring a suite of analytics tools.

4. Relator has extensive experience in integrated health care systems, business development, technology build-out, procurement, personnel recruitment and retention, and fiscal management and reporting; he developed a novel care management model for complex, co-morbid health issues in partnership with medical provider teams, lowering all case admission, re-admission and emergency services rates and improving other complex health management systems.

5. Relator was the founder and directing partner of PCDG, an integrated care practice in North Carolina; he developed a practice that coordinated care across multiple service lines to improve behavioral health outcomes and lower incidences of inpatient admission and emergency room utilization; PCDG partnered with Next Gen ACO Cornerstone Healthcare and Wake Forest University, among other major regional healthcare entities, and by late 2017 was a thriving business.

6. In 2018, the Relator commenced working at OCV, where he was assigned to conduct diligence studies of the Health Catalyst and Vermont Information Technology Leaders data storage and analytics systems, which along with "Care Navigator," a UVMMC "Legacy" SQL server, and other third-party tools, comprised what is known as the WorkBench One ("WBO").

7. The functionality of OCV's analytics programs is critical to OCV's role as Vermont's chosen fiduciary for the disbursement to providers of $650 million in funds provided by the Centers for Medicare & Medicaid Services and Blue Cross Blue Shield. In total, approximately $3 million of OCV's $12 million annual operating budget went toward the WBO systems, and OCV paid more than $500,000 in salary to its in-house analytics and informatics team.

**The Defendants**

8. Defendant OneCare Vermont is a Vermont corporation established and partially funded by the two other defendants as an accountable care organization.

9. OneCare works with a network of providers to coordinate health care for approximately 43,000 of Vermont's 118,000 Medicare beneficiaries; the organization's objective is, *inter alia*, to ensure providers are accountable for

coordinating the health of a defined population without changing the program for Medicare beneficiaries or exposing providers to financial risk from Medicare.

10. Defendant UVMMC is a Vermont Non-Profit Corporation, headquartered in Burlington, Vermont; it was one of the originators of OneCare and continues to provide strategic and management direction and funding to the organization.

11. UVMMC is the primary investor in OneCare, owning at least a 50% interest in the organization.

12. UVMMC's executives and managers advise, direct, and, indirectly, operate OneCare.

13. One executive, John Brumstead, MD, is a board member of UVMMC; he approves all operational expenses for the OneCare's ACO project.

**Factual Background to the Claims**

14. The Relator incorporates paragraphs 1-13 into this claim.

15. In March 2018, the Relator commenced working on diligence studies of the Health Catalyst and Vermont Information Technology Leaders data storage and analytics systems and the WBO package.

16. The functionality of OneCare's analytics programs is critical to its role as Vermont's chosen fiduciary for the disbursement to providers of $650 million in funds provided by the Centers for Medicare & Medicaid Services and Blue Cross/Blue Shield.

17. Approximately $3 million of OneCare's $12 million annual operating budget was devoted to WBO systems; OneCare paid more than $500,000 in salary to its in-house analytics and informatics team.

18. UVMMC contracted with Health Catalyst in 2014 for its software to provide an immediate solution to receive claims-based and clinical data streams from healthcare

providers to track patient outcomes, replacing the Legacy SQL server that required more manual data extraction and analysis to run reports.

19. As ACO Analytics manager for defendants, the Relator expressed concerns regarding functionality and deficiencies in OneCare's data storage and analytics systems, the WBO.

20. The Relator discovered that Health Catalyst was not delivering the product OneCare needed to deliver its promised products for health care providers, including Medicare and Medicaid.

21. To correct the deficiencies, UVMMC was forced to layer numerous other internal and third-party systems over Health Catalyst's systems; "Care Navigator," one of the layered tools, was suggested to enable all healthcare providers and practice administrators to meet the demands of the four-quadrant model of clinical integration of primary and behavioral health services – fundamental to the ACO's purpose to improve healthcare quality and clinical outcomes.

22. OneCare's plan was for the software it contracted to provide claims-based and clinical data streams from healthcare providers quickly and efficiently to track patient results. But the software did not meet the expectations or the system's needs to meet its promised products for health care providers – including Medicare and Medicaid.

23. OneCare was forced to attempt to correct the deficiencies but the corrections failed; the provider network could not use the data in the system, creating significant problems with the entire data repository.

24. As ACO manager, the Relator discovered that the system and its healthcare data were flawed – and virtually useless.

25. The stakeholders' funds for the new system were essentially wasted.

26. Nevertheless, OneCare portrayed the opposite of Relator's findings – that the tools were functional and utilized extensively – despite his findings and reports to the contrary; the organization lied to its sponsors, including the federal and state governments, about the system's status and usefulness.

27. The Relator consulted his predecessor at the ACO, who attested that the system was useless; but OneCare's leadership disbelieved her findings.

28. The Relator reviewed the OneCare contracts, including those with Medicare and Medicaid, and background information; the contractual obligations were based on OneCare's positive representations of its capabilities; OneCare had exaggerated its capabilities to the sponsors, especially Medicaid.

29. The Relator concluded that OneCare's products would not function as promised and were wasting significant sponsor funds.

30. The Relator also concluded it may be in breach of its contracts with healthcare providers who depended on its analytics and data services.

31. The Relator found that the OneCare staff was dismayed over the system's failure to deliver, as projected and professed to its sponsors.

32. OneCare's leadership acknowledged the system's failure, concluding it was inoperable, noting that for patients who present with multiple diagnoses, the system produced distorted and inaccurate reports that might cause erroneous billings, including excessive reimbursable charges and status reports to the healthcare providers, including Medicare and Medicaid.

33. The result of the inaccurate reporting was faulty benchmarks against which governmental and private payers hold healthcare providers accountable for patient results and funding savings.

34. Thus, the healthcare providers depending upon the system's functionality and the data it promised, including Medicare and Medicaid, were disadvantaged in terms of monetary savings; thus, the basic purpose of an ACO was deeply questionable and undependable – as OneCare's leadership admitted.

35. The result of the breakdown in the system's data accuracy and dependability was that the system was useless as an analytics platform, despite its significant cost – running well in to multi-millions of dollars from sponsors, including the federal and Vermont state governments.

36. The Relator protested to the OneCare leadership about the system's unreliability, including the data storage and analytics deficiencies, and the leadership's failure to disclose data management inconsistencies that constituted misrepresentations to sponsors about OneCare's capabilities.

37. Some of the OneCare leadership were receptive and concerned, yet others stonewalled Relator and his reports of the system's unreliability and the wasted sponsor investments.

38. The Relator protested the organization's inconsistencies and misrepresentations because it held a fiduciary duty under the governmental contracts that covered their funding collections from sponsors and distributions to the governments' healthcare for reimbursements and incentives.

39. The Relator protested that the system was causing sponsors and healthcare providers and payers many millions of funding dollars because of poor data integrity that was not trustworthy, and whose value to them was questionable.

40. Providers and care coordinators in the provider network expressed mistrust of the data.

41. The Relator urged OneCare's leadership to consider its fiduciary and contractual duties to the stakeholders to provide accurate, empirical analysis of its reliability and accuracy.

42. OneCare's leadership rejected the Relator's complaints about the trustworthiness of the data and the breach of its duty to sponsors and healthcare providers, including Medicare and Medicaid.

43. Meanwhile, OneCare continued to present positive accuracy and value assessments to stakeholders, including the federal and Vermont governments, claiming its analytics tools were "highly sophisticated and actionable," and that healthcare providers were actively using its self-service tools to track disease statistics, utilization rates, and outcomes, and were acting on its data.

44. The Relator attempted to persuade OneCare leadership to disclose to its contractors that the flaws in the system must be corrected to preserve the stakeholders' confidence and justify the significant funds devoted to the project, because there was a considerable disparity between data sources that were outside a reasonable confidence interval.

45. OneCare's leadership continued in denial about the low data accuracy and trustworthiness, and cast doubt on the Relator's analysis and reports about its low data accuracy and trustworthiness; its managers continued to proclaim the value of the system's data for healthcare providers in its presentation of "network success."

46. UVMMC, the principal investor and owner, agreed with the assessment by OneCare's leadership, and continued on an unvarying path as if there were no deficiencies in the system.

47. The Relator concluded that OneCare leadership would not commit to revising the systemic approach to analytics or to disclosing their tools' inaccuracies and dysfunctionality; instead, OneCare leadership intended minimal repairs only to demonstrate incremental improvements, but failed to fulfill its obligations to providers and other stakeholders, including federal and state governments who funded the ACO, even though a few managers admitted OneCare's data – including data processed by one of its contractors – were of low value.

48. OneCare had paid out at least $1.2 million for worthless work on the project from a contractor – primarily federal funds that supported the effort – in addition to the funds delineated in Paragraph 7, above, when OneCare could have performed the same work for far less money.

49. The Relator also expressed concern about protection of private patient care information under the Health Insurance Portability and Accountability Act ("HIPAA"); OneCare dismissed the Relator's concern.

50. The Relator protested OneCare's representation of its analytics tools as being "stood up" and functional, as the claim was false and misrepresented its product and its capabilities to the healthcare provider network and payers in order to grow its operating budget.

51. The Relator's numerous protests about the trustworthiness of OneCare's data products, its capabilities, and its continued promotion of its products as valuable to stakeholders, including the federal and state governments, were rejected, and OneCare's leadership threatened him with discipline; it claimed his "criticisms" of the organization's tools and its misrepresentations were damaging morale.

52. Finally, the Relator suggested that OneCare and its sponsors, especially UVMMC, as principal investor and owner, were raising and spending federal and state governmental funds based on false representations, violating the federal and state False Claims Acts.

53. The Relator questioned the organization's promotion of its analytics and data processing capabilities to health care providers in the network on the basis that OneCare's untrustworthy data may cause those providers to violate the same statutes.

54. After the leadership's threat to the Relator, it fired him; OneCare later accused the Relator of poor performance and failing to "meet expectations;" the allegations were false.

55. In the interim, millions of dollars raised from federal and state governments and others were spent on products that were inaccurate and virtually worthless for the health care provider network.

## The Relator's Claims:
## Illegal Retaliation under State and Federal Law

56. The Relator incorporates paragraphs 1-55 into this claim/demand.

57. UVMMC is the principal investor and owner of OneCare; they are partners in the venture that is OneCare.

58. UVMMC and OneCare are and remain liable for OneCare's actions and violations of the statutes.

59. The statutes forbid retaliation against an employee who protests false and/or fraudulent claims against the United States of America and the State of Vermont.

60. As demonstrated in the foregoing factual allegations and the related evidence, the defendants threatened and fired the Relator because of his protests concerning their

false claims to promote funding support from its sponsors, including the United States of America and the State of Vermont, including, *et alia,* the Medicare and Medicaid programs.

61. When the Relator refused to be silent as defendants demanded, they fired him.

62. As demonstrated in the foregoing factual allegations, OneCare's reasons for dismissing the Relator constituted a pretext for removing him from the organization because of his protests about its capabilities and its misrepresentations to stakeholders, including the federal and state governments on the funding side, and the healthcare providers, including Medicare and Medicaid, on the user side.

63. OneCare's actions and those of its principal owner/investor, UVMMC, constitute illegal retaliation against the Relator under the statutes.

64. For defendants' violations of the statutes, the Relator demands:

   a. The defendants be ordered to cease and desist violating the statutes;

   b. Judgment against the defendants in an appropriate amount according to their violations of the statutes and an award of damages to the United States of America and the State of Vermont due to the defendants' actions, plus an appropriate and authorized civil penalty against the defendants for each violation of the statutes;

   c. A maximum award for the Relator based on his efforts to resolve and halt the false government claims through complaining and reporting defendants' violations, and their retaliation against him for the same;

   d. An award of costs of this action, including attorney's fees and expenses to the Relator as the statutes authorize;

e. An award of such other relief as the Court deems just and proper under the statues.

## **Wrongful Termination from Employment in Violation of Vermont's Public Policy**

65. The Relator incorporates paragraphs 1-64 into this claim/demand.

66. After the Relator protested OneCare's untrustworthy provision of health data processing systems to healthcare providers, including Medicare and Medicaid, and the misrepresentation of the value and usefulness of its products for them, defendants fired him.

67. There was no cause to fire the Relator because his performance was memorialized as positive and satisfactory.

68. Defendants' only motivation for dismissing plaintiff was retaliation for his protests concerning OneCare's untrustworthy provision of health data processing systems to healthcare providers, including Medicare and Medicaid, and misrepresentation of the value and usefulness of its products for them.

69. Defendants' dismissal of plaintiff was, thus, illegal retaliation against him for protesting OneCare's untrustworthy provision of health data processing systems to healthcare providers, including Medicare and Medicaid, and misrepresentation of the value and usefulness of its products for them.

70. Defendants' dismissal of plaintiff violated Vermont's public policy, expressed throughout Vermont law, which encourages honesty in business dealings, transactions and representations.

71. Defendant's dismissal of the Relator was born out of malice towards him for his protests.

72. Defendants recklessly disregarded the Relator's rights in dismissing him for his protests.

73. Defendants' dismissal of the Relator caused disruption to his career; it caused him to suffer significant losses in compensation, benefits and related expenses.

74. The Relator demands judgment against defendants for its illegal, malicious retaliation against him.

75. The Relator also demands a monetary award of lost compensation, benefits and other career losses, including his reputation and related expenses, and other compensatory, punitive and liquidated damages, plus attorney's fees and court costs.

DATED: 7/27/2018   .                                   **ROBERT HOFFMAN, RELATOR**

By: _[signature]_
Norman E. Watts
Watts Law Firm PC
Relator's Attorney